**STATE of Missouri, Respondent,**

v.

**Glenn B. MANSFIELD, Appellant.**

**No. WD 34810.**

Missouri Court of Appeals,
Western District.

July 17, 1984.

John R. Mencl, Independence, for appellant; J.D. Williamson, Jr., Independence, of counsel.

John Ashcroft, Atty. Gen., Dan J. Crawford, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and SOMERVILLE and KENNEDY, JJ.

PRITCHARD, Presiding Judge.

By the verdict of a jury, appellant was convicted of the commission of the crime of murder in the second degree. The jury assessed the punishment at life imprisonment, and the court sentenced appellant in accordance with the verdict.

The sufficiency of the evidence is not questioned. Appellant was charged with unlawfully killing Louise Byers by beating her between February 8, 1980 at 2300 hours and February 10, 1980 at 1600 hours, thereby causing her to die on or about February 10, 1980. The evidence was that the victim was 91 years old and lived alone. A close friend, Patricia Boesch, found her body at about 4:00 p.m., on Sunday, February 10, 1980. Blood on papers found at the scene was the victim's blood type. A negroid pubic hair was found in the victim's left-hand, and the hair was found to match appellant's pubic hair. A shoe print on one of the papers in the northeast bedroom was testified to have been made by a boot taken from appellant. Fingerprints in the blood on papers at the scene were found to match those of appellant.

Herbert Leonard had known the victim about 7 years and talked to her on the telephone at about 4:00 p.m., Saturday, February 9, 1980. He also saw her standing on the front porch at 1315 East 75th Street at about 4:15 or 4:35 p.m., on Friday, February 8.

On February 15, 1980, appellant told Sergeant Chester Rice that he had known the victim for about 10 years, and that he lived three houses west of her. He had never been on the second floor of her house. Around midnight on February 8, appellant was going home when he saw two negro males run from the victim's residence and across the street. He shouted at them and one of them dropped something, then appeared to pick it up and they left in a white car. Appellant then told Rice that being concerned about Ms. Byers, he went to her house where he found her body and immediately left.

Mrs. Boesch testified that she came back two days after the victim's death, and

found the northeast upstairs bedroom to have been ransacked. The antenna on the dining room television had been bent into a "z" shape, and she noticed that some real old souvenir-type spoons were missing from the dining room buffet.

■ By Point I, appellant contends that the trial court erred in restricting his argument to the jury with respect to the credibility of state's witness, Herbert Leonard. Leonard had testified that he telephoned and talked with the victim at about 4:00 p.m. on Saturday, February 9, 1980. The state argued to the jury that the victim's death occurred between 4:00 p.m. on Saturday, and 4:00 p.m. on Sunday, February 10, when her body was found. Appellant testified that he found the victim's body on Friday night at about midnight. The amended information charged that the homicide occurred between 11:00 p.m. on Friday, February 8, 1980, and 4:00 on Sunday. Appellant counsel argued: " * * * I guess the State isn't too certain about their evidence that comes from Herbert Leonard. He says he talked to her on Saturday afternoon. They are saying to you, 'If Herbert wasn't telling the truth, about talking to her'—MR. HALL: Your Honor, I'm going to object to that. Those are instructions by the Court. It's improper argument to make argument on—MR. WILLIAMSON: He's charged by the State, Your Honor. THE COURT: They are the Court's instructions, sir." Quite apparently, counsel for the state and the court were confused as to the gist of appellant's argument (that it referred to instructions). Neither counsel completed their statement or objection, and appellant did not inform the court as to what he really intended to argue with respect to Leonard's testimony. There is no basis to believe, however, that the state did not believe its witness, Leonard. The state merely altered its argument to conform with the evidence that the victim was alive on Saturday, February 9, 1980, rather than, as charged, that the homicide occurred between Friday and Sunday. Nothing appears for which the trial court may be convicted of error in restricting appellant's argument, and Point I is overruled.

Appellant took the stand and testified on direct examination that on Friday night, February 8, 1980, at about 12:00 p.m., he had returned to his mother's house where he waited for Robert Lee to open the door. He then heard a noise and saw two people running by. He sat a sack of beer inside the door, and walked down to Miss Byer's house, where he heard some noise and saw two guys running from her house. The lights were on in the house which he thought was strange because it was so late. He went to the door, which was open, called for her, but received no answer, and he subsequently saw her body at the top of the stairs after which he left, being scared. As to the two men he saw running from the house, appellant thought from their hair pattern that they were Negroes. Appellant went back to his mother's home, and did not at any time call the police. He denied beating, assaulting or killing the victim.

On cross-examination, appellant testified that as he saw the two men running off the porch, he yelled at them for the purpose of trying to stop them. He thought that something was amiss at Miss Byer's house, that she might be in trouble, and that there was a possibility that her life might be in danger.

The prosecutor then proceeded further to cross-examine appellant in regard to the two men that he saw running from the victim's house. He testified then that it appeared that the two men dropped something, but he denied going over and picking it up. He was asked whether on a previous hearing he had not testified that he believed he did pick up something that dropped. He denied remembrance of that testimony, and did not remember picking up any sack. He did not deny that he had previously testified that he believed he picked up the sack, but did not remember if he said that or not. Then, "Q. (By Mr. Hall) What did you do with the sack after you picked it up? MR. WILLIAMSON: I object. Assuming facts not in evidence. THE COURT: Overruled. Q. (By Mr.

Hall) What did you do with the sack after you picked it up, sir? A. I'm not certain I picked it up." Appellant went on to testify of telling his mother about a sack, but it was not the one that came from the victim's house that he saw the two men drop. He got that sack, which contained silverware, from Dolores Smith for $20.00, at the Green Duck Bar, 26th and Prospect, but he did not tell his mother that. He told her he saw two guys running across the street and drop a sack. He told her that on the morning, February 10th, when he sold the silverware to Mr. Lawson. He told Detective Rice, in a statement, that he had gotten the silverware at the Green Duck Bar on February 8th.

The trial court had excluded the silverware (apparently that which was sold to Lawson) from evidence on the ground that it was not connected with the victim. By Point II, appellant claims that the above quoted question put to him assumed a fact not in evidence, and it injected the previously excluded matter, and therefore, the court erred in overruling his objection to the question. He says the question injected a false issue. This matter is related to Point III, asserted as plain error, that the questions asked about the sack of silverware went beyond the permissible scope of cross-examination allowed by § 546.260 RSMo 1978. The two matters will be considered together.

The clear import of appellant's direct testimony was to absolve himself of the commission of the homicide and to fasten it on the two men he claimed to have seen running from the victim's home. In *State v. Williams*, 519 S.W.2d 576, 578[1–6] (Mo. App.1975), the rules as to the permissible scope of cross-examination under the statute are discussed: "The general principle laid down in many decisions is that the state is not confined to a categorical review of the matter covered or stated in the direct examination, but that cross-examination may cover all matters within the fair purview of the direct examination. [Footnoting cases.] * * * The 'matter' referred to in the examination in chief means the things he testifies about. If the defendant in his examination in chief refers to a subject in a general way, he may be examined in detail as to that subject. When he states a fact in relation to his actions, the state may inquire as to particular circumstances which would throw light on that fact. (Citing case.) He may be cross-examined with reference to any subject matter concerning which he gave testimony. (Citing case.)"

Appellant's direct testimony as to the two men running from the victim's house was exculpatory in nature. The cross-examination of the state was therefore within the purview of that direct testimony, and under the Williams case, supra, it was entitled to go into the *details* of that subject, which included whether he picked up a sack dropped by the two men, what he did with *that* sack, whether it contained silverware, and what was the source of the silverware that he sold to Lawson. In view of what was developed in cross-examination concerning appellant's various stories on the subject, there was certainly an issue of his credibility as a witness in testifying that he saw two men running from the victim's house. The question did not inject a false issue in the case, and the cross-examination, being within the purview of the direct examination, did not offend § 546.-260. Points II and III are overruled.

The judgment is affirmed.

All concur.